**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ISOM WOODS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-01214 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| VILLAGE OF BELLWOOD, a Municipal | ) | |
| Corporation, BELLWOOD POLICE | ) | |
| DEPARTMENT, MICHAEL ADAMSKI, | ) | |
| and CAMERON WOODS-ORTIZ, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## MEMORANDUM OPINION AND ORDER

Isom Woods celebrated his birthday with a night out clubbing in downtown Chicago. On his way home, he stopped for some late-night food, and then hopped on the interstate. But he soon noticed a change in his ability to drive. In his words, he felt "sleepy." So, instead of driving home, he decided to pull into a parking lot to rest. Woods was trying to be careful. But he ended up in the backseat of a police cruiser.

Hours after falling asleep in his truck, he awoke to two police officers shouting and banging on his windows, ordering him to get out of his vehicle. It turned violent. He claims that the two officers, Defendants Michael Adamski and Cameron Woods-Ortiz, dragged him out of his vehicle, tased him for no reason, and slammed him to the ground. But the officers tell a different story. They claim that Woods resisted orders and ignored their commands, necessitating the use of force.

They searched the truck, discovering a loaded semiautomatic handgun. That discovery led to criminal charges by the state for unlawful possession. But the state ultimately dropped the

charges after the state court suppressed evidence of the gun, finding no probable cause for the search.

Woods later filed this case against the officers, the police department, and the Village of Bellwood, claiming false arrest, excessive force, malicious prosecution, and other claims. Defendants moved for summary judgment. By and large, the facts are hotly contested, with evidence on both sides, so a jury needs to sort it out. The motion for summary judgment is granted in part and denied in part.

## Background

On June 2, 2017, Plaintiff Isom Woods drove his red Chevy SUV to downtown Chicago for a night out. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 1 (Dckt. No. 41). He drank "a few" – he says two – Long Island iced teas, a beverage containing vodka, tequila, gin, rum, triple sec, sour mix, and cola. *Id.* at ¶ 2; *see generally Long Island Iced Tea*, Wikipedia, https://en.wikipedia.org/wiki/Long_Island_iced_tea (last visited Nov. 19, 2020) ("The drink has a much higher alcohol concentration (approximately 22 percent) than most highball drinks due to the relatively small amount of mixer."). Around midnight, Woods left the club, got into his vehicle, and decided to grab some late-night food. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 3. He then headed home on I-290. *Id.* at ¶ 4.

Woods soon noticed a "marked change" in his ability to drive. *Id.* at ¶ 5. He started "getting sleepy." *Id.* So, he exited the expressway and pulled into a parking lot next to a gas station in Bellwood, Illinois. *Id.* at ¶¶ 5–6, 9. He parked his truck in a Dunkin Donuts parking lot. *See* Suppression Hr'g. Tr., Defs.' Ex. B, at 7:7-21 (Dckt. No. 35-2, at 8 of 60).

He intended to "take a nap and then wake up and drive the rest of the way home." *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 2 (Dckt. No. 39). Woods says that he fell asleep

around 1:00 a.m. *Id.* The nap lasted a while. He was still asleep at 5:30 a.m., more than four hours later.[1] *Id.*; *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 7 (Dckt. No. 41).

While Woods slumbered, a manager at a nearby BP gas station called 911 and reported the idled vehicle. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 7, 9 (Dckt. No. 41). The manager reported that the truck had been sitting in the parking lot for over an hour. *Id.* at ¶ 7.

Officer Adamski ultimately received word of the 911 call. He received a complaint that someone was "passed out or sleeping in a red truck." *Id.* He was assigned to investigate a "suspicious vehicle." *Id.* at ¶ 8. When Adamski arrived on the scene, the gas station attendant pointed out the red truck. *Id.* at ¶ 11. (Adamski admits that he doesn't remember the manager saying anything – just pointing.) The parties disagree about whether the vehicle was appropriately parked in the parking spot. *Id.* at ¶ 12.

Officer Woods-Ortiz soon arrived, too. *Id.* at ¶ 17. The two officers approached the vehicle and observed someone "unresponsive in the front seat." *Id.* at ¶ 14. The unresponsiveness was not a good sign. *Id.* at ¶ 13. Officer Adamski thought that it was possible that the driver was just sleeping. *Id.* Or maybe it was a sign of drug use, intoxication, or death. *Id.* But the officers did not see any drug paraphernalia or open container of alcohol. *See* Defs.' Reply to Pl.'s Statement of Facts, at ¶ 10 (Dckt. No. 50).

---

[1] Under Local Rule 56.1(b)(3)(C), a non-movant may file a "statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment." *See* Local Rule 56.1(b)(3)(C). Woods took advantage of that opportunity by filing a statement of additional facts with his response to the motion for summary judgment. *See* Dckt. No. 41. But Woods then cited additional facts – meaning facts *not* included in his statement of additional facts – in his response brief. The "Facts" section of his response brief is loaded with other facts, with citations to transcripts, pleadings, and so on. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 1–4 (Dckt. No. 39). An example is the notion that Woods slept for four hours before the police officers woke him up. *Id.* at 2. A non-movant cannot inject additional facts into the record in a response brief if those facts do not appear in a Rule 56.1 statement. By injecting new facts without following the procedure, Woods deprived Defendants of the opportunity to respond as contemplated by the Local Rules. So, under the Local Rules, the new facts in the brief don't count. Still, the Court cites a few of them in the background section of the opinion because they add color and tell a better story. But for purposes of the ruling, the facts are immaterial and carry no weight.

For three minutes, Officer Adamski pounded on the window, attempting to rouse Woods. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 15 (Dckt. No. 41). Adamski yelled at Woods to wake up, and announced himself as a police officer. *Id.* at ¶ 16. No luck.

Officer Woods-Ortiz also began knocking on the passenger window, trying to wake Woods up. *Id.* at ¶ 17. It wasn't working. Despite the noise, Woods remained unresponsive. *Id.* at ¶ 18. As minutes passed, Adamski grew so concerned that he planned to call the paramedics for assistance with the seemingly-unconscious person. *Id.*

Finally, the persistent knocking and shouting did the trick. *Id.* at ¶ 19. Woods woke up, and saw the officers banging on the windows. *Id.* He had no idea how long the officers had been knocking on his windows. *Id.* at ¶ 20. Woods was disoriented. He was "startled and shaken up," and he "did not understand immediately what was going on." *Id.* at ¶ 22.

Adamski demanded that Woods open the door, and threatened to break the glass if Woods didn't comply. *Id.* at ¶ 24. The officers banged on the window, and Woods heard "get out the car, get out the car, get out the car." *Id.* at ¶ 26. Woods lowered his window halfway. *See* Defs.' Reply to Pl.'s Statement of Facts, at ¶ 12 (Dckt. No. 50).

One of the officers ordered: "[L]et me see your hands, let me see your hands." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 27 (Dckt. No. 41). The officers continued yelling and banging on the windows. *Id.* at ¶ 29.

In response, Woods showed his hands and then reached for something with his left hand. *Id.* at ¶ 28. He reached for the lever between the door and the driver's seat so that he could raise his seat. *Id.* at ¶¶ 28–29. He apparently reclined the seat before falling asleep to make himself more comfortable. Officer Woods-Ortiz saw Woods shift down toward the bottom of the seat. *Id.* at ¶ 30.

4

Maybe the act of reaching for something was a triggering event (according to the officers' side of the story, that is). But Woods testified that he showed his empty hands to the officers *after* he raised his seat. *See* Suppression Hr'g. Tr., Defs.' Ex. B, at 29:3-13 (Dckt. No. 35-2, at 30 of 60). He put up the seat, showed his hands again, and started to get out of the car:

Q:     And when you went to raise your seat up, what did you do next?

A:     I was showing him my hands and got out the car.

Q:     And then you got out of the car? You did?

A:     Yes.

Q:     Okay. And that's the order that you did it in; right?

A:     I let my seat up – I let my seat up. I'm showing him my hands, and I'm getting
       out the car.

*Id.*

Whatever the cause, the officers forcibly removed Woods from the vehicle. Eventually "the door was opened," but the use of passive voice hides who pulled the handle. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 31 (Dckt. No. 41). Officer Adamski attempted to gain control of Woods to get him out of the truck. *Id.* at ¶ 30. It got physical. *Id.* at ¶ 32. Officer Adamski grabbed Woods by his arms and pulled him out. *Id.* at ¶ 31.

Up to that point, the parties largely agree on the underlying facts (except the part about Woods showing his hands after raising the seat). But from that point on, the stories diverge. The parties disagree about why things turned physical.

The officers claim that they were trying to deal with an unruly, non-compliant member of the public. The officers testified that Woods failed to listen to their verbal demands and failed to comply with instructions to open the door. *Id.* at ¶ 32. But Woods paints himself as a victim of

heavy-handed police work. Woods testified that he "cooperated with the officers and obeyed their commands." *Id.*

Officer Adamski pulled Woods out of the truck. *Id.* at ¶¶ 33–34. Woods responded by pulling away. *Id.* Woods testified that he pulled away because the officer violently yanked and hurt his wrists. *Id.* Again, the parties tell different stories. The officers testified that Woods was resisting, and that Officer Adamski had a difficult time removing Woods from the vehicle. *Id.* at ¶ 36. But Woods insists that he was compliant. *Id.*

Things quickly escalated. Officer Woods-Ortiz shot Woods with the taser, hitting him in the back of his shoulder. *Id.* at ¶ 37. Again, the parties disagree about what happened next. The officers claim that Woods remained standing, so one of the officers grabbed him. *Id.* at ¶ 38. But Woods testified that one of the officers immediately slammed him to the ground after he was tased. *Id.*

Everyone agrees that the officers eventually restrained Woods on the parking lot pavement. Woods says that he suffered wrist lacerations, a bloodied nose, and taser prong marks on his back. *See* Defs.' Reply to Pl.'s Statement of Facts, at ¶ 18 (Dckt. No. 50).

One of the officers later discovered a loaded handgun in the truck. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 40–41 (Dckt. No. 41). The *location* of the gun is a point of contention, but the *presence* of the gun is not. Woods admits that he possessed a loaded semiautomatic handgun in his vehicle at the time of the arrest. *Id.* at ¶¶ 40–42; *see also* Photographs (Dckt. No. 37, at 40–41, 75–77 of 81). The officers claim that they found the firearm on the floorboard of the vehicle. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 42. But Woods testified that the gun was under his seat. *Id.* So they disagree about whether the gun was in plain view.

6

The discovery of the gun was problematic because Woods did not possess a valid Firearm Owner's Identification card or a valid concealed carry license. *Id.* at ¶ 43. Woods was ultimately charged with a felony weapons offense under 720 ILCS 5/24-1.6(a)(1) and with resisting and obstructing a peace officer under 720 ILCS 5/31-1(a). *See* Defs.' Reply to Pl.'s Statement of Facts, at ¶ 21 (Dckt. No. 50).

But he was never convicted. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 44 (Dckt. No. 41). Woods moved to suppress the evidence of the gun found in his truck, and the state court suppressed the evidence. *Id.* The court concluded that the gun – found underneath the driver's seat – was not visible to the officers at the time of his arrest. *See* Suppression Hr'g. Tr., Pl.'s Ex. 1, at 70:10-14 (Dckt. No. 43, at 70 of 72); *see also* Defs.' Reply to Pl.'s Statement of Facts, at ¶ 24 (Dckt. No. 50). The prosecution eventually dropped the charges.

Woods later filed this action in federal court. He advanced six claims against the two officers, the Village of Bellwood, and the Bellwood Police Department: (1) false arrest and imprisonment; (2) failure to intervene; (3) excessive force; (4) malicious prosecution; (5) indemnification; and (6) respondeat superior. *See* Cplt. (Dckt. No. 1). He later filed an amended complaint, adding claims for assault and battery. *See* Am. Cplt. (Dckt. No. 20).

The officers now move for summary judgment. Their motion relies largely on their own side of the story, even though Woods has a different story to tell.

### Legal Standard

Rule 56 provides that the Court "shall grant" summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute about a material fact exists if the "evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotation marks omitted).

Courts must "'consider all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw all reasonable inferences from that evidence in favor of the party opposing summary judgment.'" *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). The non-moving party receives "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted).

## Discussion

### I. False Arrest (Count I)

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Count I is a false arrest claim. *See* Am. Cplt. (Dckt. No. 20). Woods alleges that the officers "unlawfully detained and falsely arrested Plaintiff without justification and without probable cause." *Id.* at ¶ 20. He calls the claim "false arrest," but he appears to complain about the initial stop by the police, as well as the subsequent arrest. *Id.* at Count I.

Different standards apply to a brief detention and an arrest. So the Court will address them separately, too.

### A.     The Stop

Based on the undisputed facts, Woods has no claim about the initial decision by the officers to check on him and make sure that he was alright.  But a jury will need to decide if the officers had reasonable suspicion of wrongdoing that could support a command to exit the truck.

It all started with a 911 call about a suspicious vehicle, with someone sleeping or passed out inside.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 7–8 (Dckt. No. 41).  When the officers arrived, they found Woods in the driver's seat, unresponsive.  *Id.* at ¶ 14.  It was possible that he was just catching some much-needed shut-eye – in the parking lot of a Dunkin Donuts, in the middle of the night.  But there were other possibilities, too, including an overdose, intoxication, and even death.  *Id.* at ¶ 13.

The officers tried to rouse him for three minutes, yelling and pounding on the windows, without success.  *Id.* at ¶¶ 15–17.  They were about to call the paramedics when Woods finally came to.  *Id.* at ¶ 18.  But he wasn't all there – he was "startled and shaken up and did not understand immediately what was going on."  *Id.* at ¶ 22.  So the officers directed Woods to get out of the vehicle.  *Id.* at ¶¶ 24, 26.

In their brief, the officers jump right to reasonable suspicion for a *Terry* stop, arguing that they had a basis to believe that Woods was engaged in wrongdoing.  But there is another doctrine that fits these facts, which all parties overlook.  *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 5–9 (Dckt. No. 39); Defs.' Mem. in Supp. of Summ. J., at 6–9 (Dckt. No. 34).  Police do not simply investigate crimes – they care for the public, too.  "The community caretaking doctrine recognizes that police sometimes take actions not for any criminal law enforcement purpose but rather to protect members of the public . . . ."  *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 553 (7th Cir. 2014); *see also Cady v. Dombrowski*, 413 U.S. 433 (1973).

9

The police are allowed to check on incapacitated people in vehicles in public places without running afoul of the Constitution. For example, in *Long*, the police found a person fast asleep behind the wheel in the drive-through lane of a McDonald's at 4:20 a.m. *See Long v. United States*, 847 F.3d 916, 920–21 (7th Cir. 2017). The Seventh Circuit recognized that the police had the ability to wake him up and ask him to open his car door. They acted "for a purpose totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 921 (citation omitted). "That purpose was to ensure that Long was alright. The Constitution allows officers to perform these kinds of caretaking functions . . . ." *Id.*; *see also Karney v. City of Naperville*, 2016 WL 6082354, at *5 (N.D. Ill. 2016) (recognizing that "it was reasonable for the police officers, acting in their community caretaking function, to wake Plaintiff up to check on his status" when he was "found in the parking lot of a McDonald's restaurant at 3:30 a.m. sleeping behind the wheel"); *United States v. Dickson*, 849 F.3d 686, 690 (7th Cir. 2017) ("But [Officer] Curran tried to shake Dickson awake only after 'yelling' at him failed to do so, and it is hard to see how Curran's actions could be considered unreasonable under the circumstances.").

The emergency aid exception to the Fourth Amendment applies, too. "[U]nconsciousness does not just create pressing needs; it is *itself* a medical emergency." *See Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2537 (2019) (emphasis in original); *see also Brooks v. City of Elmhurst*, 2019 WL 5395269, at *7 (N.D. Ill. 2019) ("[T]he record establishes Plaintiff was in such a state of unconsciousness that the emergency aid exception to the 4th Amendment could have been argued to justify Officers approaching to the car.") (involving a driver asleep at the wheel). The police can help unconscious people, even after they come to.

This case, like *Long*, *Karney*, and *Brooks*, involved an unresponsive body in a parked car in the middle of the night. The Constitution did not prevent the police from attempting to rouse Woods to make sure that he was alright. So the initial investigation – meaning the decision to approach Woods and attempt to wake him up – passes muster.

But the community caretaking function does not justify the command by the officers that Woods get out of the vehicle. The officers pounded on the windows, displayed a baton, and threatened to break the glass if Woods didn't exit the vehicle. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 24, 25 (Dckt. No. 41); Defs.' Reply to Pl.'s Statement of Facts, at ¶¶ 11–12, 14 (Dckt. No. 50). A threat to break windows with a baton does not seem like community caretaking. It seems more like a coercive demand that requires reasonable suspicion.

Defendants do not address the community caretaking doctrine or the emergency aid exception. Instead, they devote significant real estate in their brief to the existence of reasonable suspicion. *See* Defs.' Mem. in Supp. of Summ. J., at 6–10 (Dckt. No. 34). They argue that they had reasonable suspicion for an investigative stop under *Terry v. Ohio*, 392 U.S. 1 (1968).

"An investigatory stop complies with the Fourth Amendment if the brief detention is based on reasonable suspicion that the detained individual has committed or is about to commit a crime." *United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015) (citation omitted). *Terry* "authorizes brief investigatory detentions based on the less demanding standard of reasonable suspicion that criminal activity is afoot." *See Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014). A "brief detention" is permissible "when it demands only a limited intrusion into an individual's privacy and rests on 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Id.* (quoting *Terry*, 392 U.S. at 21).

11

The officers argue that the facts created reasonable suspicion of wrongdoing that justified a brief investigatory stop. Their first theory of wrongdoing involves a bad parking job. They argue that Woods was not in a legal parking space.[2] *See* Defs.' Mem. in Supp. of Summ. J., at 7 (Dckt. No. 34). But Woods testified that he parked legally, between the yellow lines. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 12 (Dckt. No. 41); *see also* Suppression Hr'g. Tr., Defs.' Ex. B, at 7:7-21 (Dckt. No. 35-2, at 8 of 60). There is a factual dispute about his parking, so that's not a candidate for summary judgment.

Their second theory of wrongdoing involves criminal trespass. *See* Defs.' Mem. in Supp. of Summ. J., at 8–9 (Dckt. No. 34). But a potential trespass does not appear to be the reason for the 911 call. The BP gas station attendant (who apparently did not oversee the Dunkin Donuts parking lot) called about a suspicious vehicle with an unresponsive occupant. Maybe staying too long in a parking lot could create a reasonable suspicion of a trespass, but that theory does not appear to capture what happened here. The police thought that Woods might have been impaired or deceased. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 13 (Dckt. No. 41). There is no evidence that the BP attendant accused Woods of trespassing. So the problem was his physical well-being, and perhaps his capacity to drive, not trespassing.

The officers also admitted that they did not suspect any criminality when they approached the vehicle. In their response, the officers stated that they did not believe Woods was committing any criminal act. "Defendant [Adamski] admits that he was not aware of criminal activity." *See* Defs.' Reply to Pl.'s Statement of Facts, at ¶ 4 (Dckt. No. 50); *see also* Answer, at ¶ 12 (admitting that "[u]pon approaching plaintiff's vehicle, defendant officers were

---

[2] Defendants cite to photographs of the parked vehicle, but they provide no context for them. Defendants imply that the photos capture the truck in its original position, but they do not support that implication. *See* Defs.' Exhibit E (Dckt. No. 37, at 38–39 of 81). In any event, the fact does not seem material. Woods wasn't detained or arrested for a bad parking job.

not aware of any criminal offense being violated by plaintiff") (Dckt. No. 21). And after approaching the vehicle, the police did not learn any new facts that could support a reasonable suspicion of criminal trespass.

Another possible theory is reasonable suspicion of drunk driving. Law enforcement can direct a driver to exit a vehicle when there is reason to believe that the driver might be intoxicated. *See, e.g.*, *Dickson*, 849 F.3d at 690 (holding that the officer "reasonably ordered Dickson out of the car so he could investigate Dickson for possibly driving drunk"); *Smith v. Ball State Univ.*, 295 F.3d 763, 770 (7th Cir. 2002) ("[An] officer who confronts a potentially intoxicated driver must have the discretion – without probable cause – to order the individual out of the vehicle."); *Brooks*, 2019 WL 5395269, at *8 (finding that the officer "exercised his discretion, lawfully, when he asked Plaintiff to exit the vehicle and provide identification" after he found him asleep behind the wheel and suspected intoxication or drug abuse).

The "drunk driving" theory seems to fit with the facts known to the officers at the time. The police received a 911 call about a driver in a vehicle that had been there a while. *See United States v. Drake*, 456 F.3d 771, 775 (7th Cir. 2006) ("We therefore presume the reliability of an eyewitness 911 call reporting an emergency situation for purposes of establishing reasonable suspicion, particularly when the caller identifies [himself].").  They found Woods behind the wheel in a parking lot, in the middle of the night, and he failed to respond after minutes of yelling and pounding. That's not normal behavior, and it gives rise to the reasonable belief that he was under the influence of drugs or alcohol.[3]

---

[3] From a "Family Feud" perspective, imagine asking 100 people to give a reason why a driver would be sound asleep at the wheel in a Dunkin Donuts parking lot in the early hours of the morning. A lot of people would probably guess "drunk driving." That's a solid answer. That reasonable response supports reasonable suspicion. And reasonable suspicion is enough to ask the driver out of the car. But the officers never argue that they had a reasonable suspicion of drunk driving.

But for whatever reason, the officers do not make that argument. They fail to mention the possibility of drunk driving. Maybe it is because they did not see any narcotics, drug paraphernalia, or open alcohol. *See* Defs.' Reply to Pl.'s Statement of Facts, at ¶ 10 (Dckt. No. 50). Spotting drugs or alcohol might be sufficient, but it is not necessary, either. A drunk driver could have swallowed all of the alcohol before getting in the car.

The "drunk driving" theory might fit these facts, but the officers did not move for summary judgment on those grounds. So the Court will not grant summary judgment on those grounds, either.

Woods, for his part, fails to address whether there was reasonable suspicion for an investigative stop. In fact, he does not address whether there was a basis for a *Terry* stop at all. Instead, Woods argues that there was no probable cause for the *arrest*. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 5–9 (Dckt. No. 39). He does not address whether there was a basis to detain him for investigative purposes in the first place. Still, Woods is the non-movant, and the officers had to carry the burden. They didn't, so the lack of a response from Woods does not in the end cost him his claim.

A non-responsive body inside a vehicle in a parking lot, in the middle of the night, is bound to raise questions about the driver's well-being. The motion for summary judgment is granted to the extent that the unreasonable seizure claim involves approaching and waking up Woods. The motion for summary judgment is denied to the extent that it involves directing Woods to exit the vehicle.

### B.     The Arrest

The officers had a basis to investigate the suspicious car and the unresponsive driver.  But that isn't the end of the inquiry.  The investigatory stop culminated in an arrest, which requires more than reasonable suspicion; it requires probable cause.

A seizure occurs when there is a "governmental termination of freedom of movement *through means intentionally applied*."  *Brower v. County of Inyo*, 489 U.S. 593, 596–97 (1989) (emphasis in original).  Traditionally, the inquiry looks at whether the individual believed he was free to leave.  *See Carlson v. Bukovic*, 621 F.3d 610, 618–19 (7th Cir. 2010).  The standard is an objective one, and assesses the "totality of the circumstances" surrounding the encounter.  *Id.* (quoting *United States v. Jerez*, 108 F.3d 684, 690 (7th Cir. 1997)).  Here, Woods was ultimately arrested.  An arrest is the "quintessential 'seizure of the person' under Fourth Amendment jurisprudence."  *See California v. Hodari D.*, 499 U.S. 621, 624 (1991); *Abbott v. Sangamon County*, 705 F.3d 706, 719 (7th Cir. 2013).

The situation here quickly escalated to a seizure.  Officer Adamski grabbed Woods by the arms and "attempted to gain control of Plaintiff to get him out of the vehicle."  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 30–31 (Dckt. No. 41).  Officer Adamski was "struggling to get Plaintiff out of the vehicle."  *Id.* at ¶ 36.  That's when Officer Woods-Ortiz shot him with a taser and tackled him to the ground.  *Id.* at ¶¶ 37–38.  They placed him under arrest.

The officers move for summary judgment on the grounds that they had probable cause to arrest Woods.  The existence of probable cause is an "absolute defense to a Section 1983 false arrest claim."  *See Gardunio v. Town of Cicero*, 674 F. Supp. 2d 976, 984 (N.D. Ill. 2009) (citing *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009)).  An officer has probable cause to arrest "if he has reason to believe, in light of the facts known at the time, that the suspect has

committed or is about to commit a crime." *See Gonzalez v. Village of W. Milwaukee*, 671 F.3d 649, 655 (7th Cir. 2012) (citing *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008)) (additional citation omitted). Probable cause is a "'practical, nontechnical conception' that affords the best compromise between the interests of individual liberty and effective law enforcement." *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).

As the name itself suggests, probable cause does not demand certainty. It deals in probabilities. *Abbott*, 705 F.3d at 714 (citing *Gates*, 462 U.S. at 231). And the probable cause inquiry is an objective one. The officer's "subjective state of mind and beliefs are irrelevant." *Id.* (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)).

So, courts look to the officer's knowledge at the time of the arrest and determine whether those facts and circumstances amount to probable cause, from the standpoint of an "objectively reasonable police officer." *Id.* (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). "[P]robable cause depends not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person *in the position of the arresting officer* – seeing what he saw, hearing what he heard." *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 457 (7th Cir. 2010) (emphasis in original) (quoting *Mahoney v. Kesery*, 976 F.2d 1054, 1057 (7th Cir. 1992)). It is a "fluid concept based on common-sense interpretations of reasonable police officers as to the totality of the circumstances at the time of arrest." *United States v. Shields*, 789 F.3d 733, 746 (7th Cir. 2015) (quoting *United States v. Breit*, 429 F.3d 725, 728 (7th Cir. 2005)).

Defendants argue that the later-discovered firearm in the truck – together with his failure to possess a Firearm Owner's Identification Card and concealed carry license, as required by

16

Illinois law – supports a finding of probable cause. *See* Defs.' Mem. in Supp. of Mtn. for Summ. J., at 13–14 (Dckt. No. 34). Not so. Officers cannot rely on facts that they didn't know at the time of the seizure to support probable cause. *See Pabon v. Brenka,* 2015 WL 110078, at *5 (N.D. Ill. 2015); *see also Carmichael*, 605 F.3d at 458 (noting that the officers are not entitled to "the added benefit of any facts that come to light after a relevant Fourth Amendment decision has been made"). That is, if the officers had no idea that Woods had a gun, they had no reason to arrest Woods for possessing a gun.

There is no evidence – let alone *undisputed* evidence, as required for summary judgment – that the officers knew about the gun in Woods's vehicle before they seized him. The gun cannot support a finding of probable cause for the arrest because they did not know about the gun before they arrested him.

The story was different at the suppression hearing. In state court, Officer Woods-Ortiz testified that he heard Officer Adamski yell "gun gun gun" as he was removing Woods from the vehicle. *See* Suppression Hr'g. Tr., Defs.' Ex. B, at 44:5-22 (Dckt. No. 35-2, at 45 of 60). The state court heard the testimony and was unpersuaded. *See* Suppression Hr'g. Tr., Pl.'s Ex. 1, at 70:10-14 (Dckt. No. 43, at 70 of 72) ("Officer Wood-Ortiz testified that his co-officer yelled, Gun, gun. I'm not persuaded by that declaration, and I discount Officer Woods-Ortiz['s] representations as to that [e]ffect.") (quoting the state court). For whatever reason, the officers don't tell that part of the story now. Maybe they no longer believe that Officer Adamski saw a gun when he was extracting Woods from the vehicle. Or maybe they know that it would be a disputed fact, so it would not advance their cause at the summary judgment stage. In any event, the notion that an officer yelled "gun gun gun" is not in the record because it does not appear in the Rule 56.1 statements, so the Court will not consider it. *See Rush v. MacArthur Foundation*,

2014 WL 1797581, at *4 (N.D. Ill. 2016) (noting that "the court will not consider" facts "not properly set forth in a Local Rule 56.1(b)(3) statement or response").

The only other charge that could justify the seizure was resisting arrest. A person violates Illinois law when he "knowingly resists or obstructs the performance by one known to the person to be a peace officer." *See* 720 ILCS 5/31-1. The crime involves the commission of "a physical act of resistance or obstruction … that impedes, hinders, interrupts, prevents, or delays the performance of the officer's duties, such as by going limp or forcefully resisting arrest." *Brooks*, 653 F.3d at 484 (quoting *People v. Agnew-Downs*, 404 Ill. App. 3d 218, 226, 344 Ill. Dec. 24, 936 N.E.2d 166 (2010)).

To assess whether the officers had probable cause to arrest Woods for resisting or obstructing an officer, it is important to pin down the moment of his arrest. *See Abbott*, 705 F.3d at 719 (noting that pinpointing the moment of arrest "is necessary to determine whether [plaintiff's] actions constituted resisting arrest").

An arrest involves "*either* physical force," even if slight, "*or,* where that is absent, submission to the assertion of authority." *Hodari*, 499 U.S. at 626 (emphasis in original); *see also Brendlin v. California*, 551 U.S. 249, 254 (2007) ("A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement.") (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). Woods was certainly arrested – that is, he was seized for Fourth Amendment purposes – when he was forcibly dragged from the truck, tased, and tackled. *See Abbott*, 705 F.3d at 719–20 (finding that the mother of the suspect was arrested once the officer deployed his taser because her freedom of movement was "restrained to a degree that the law associates with formal arrest"); *Brooks v. City of Aurora*,

18

653 F.3d 478, 484 (7th Cir. 2011) (finding arrestee was seized when he was incapacitated by pepper spray).

The question is whether the officers had probable cause to believe that Woods was obstructing or resisting the officer before he was seized. And the facts on that issue are hotly contested. Woods says that he never resisted Adamski, and that, once he woke up, he "cooperated with the officers and obeyed their commands." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 32 (Dckt. No. 41). He claims that he "began to exit the vehicle with his hands up when an officer grabbed his arms and forcefully pulled him out." *See* Defs.' Reply to Pl.'s Statement of Facts, at ¶ 15 (Dckt. No. 50).

But the officers tell the exact opposite story. They say that Woods "failed to listen to the officer's verbal commands and failed to comply with instructions to open the door and started reaching for something." *See* Defs.' Statement of Facts, at ¶ 32 (Dckt. No. 35). And they insist that Woods was "resisting Adamski when Woods-Ortiz deployed the taser." *Id.* at ¶ 36.

Each side tells a different story, backed by admissible evidence. Woods testified that he cooperated, and the police testified that he resisted arrest. So there is a genuine issue of material fact, and a jury will need to sort it out. The motion for summary judgment is denied on the false arrest claim to the extent that it involves the arrest itself.

## II.     Excessive Force (Count III)

Woods also brought an excessive force claim against the officers. He alleges that there was no legitimate reason for them to shoot him with a taser and slam him to the ground.

Like the false arrest inquiry, the excessive force inquiry is an objective one. When assessing whether the use of force during an arrest is proper under the Fourth Amendment, courts look to the objective reasonableness of the officer's actions, in light of the conditions that the

officers faced. *See Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009). Courts "must consider all the circumstances," including "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Scott*, 576 F.3d at 660 (quoting *Graham*, 490 U.S. at 396).

The question is whether, "in light of the facts and circumstances that confronted the officer (and not 20/20 hindsight), the officer behaved in an objectively reasonable manner." *Padula v. Leimbach*, 656 F.3d 595, 602 (7th Cir. 2011) (quoting *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010)). Police officers, unlike judges, do not have the luxury of sitting back and reflecting on their decisions. Sometimes police officers must make split-second decisions in the heat of the moment, and confront a difficult situation as best they can. To account for "the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation," *Graham*, 490 U.S. at 397, courts "give considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations." *Baird v. Renberger*, 576 F.3d 340, 342 (7th Cir. 2009).

The officers insist that they used reasonable force when arresting Woods. *See* Defs.' Mem. in Supp. of Summ. J., at 14–15 (Dckt. No. 34). But at the summary judgment stage, that argument faces a steep uphill battle. Indeed, "summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly," because the reasonableness inquiry "nearly always requires a jury to sift through disputed factual contentions." *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)). This case is no exception.

20

The officers rely on their own story in their motion for summary judgment, turning the procedural standard on its head. As they tell it, Woods "failed to listen to the officer's verbal commands and failed to comply with instructions to open the door." *See* Defs.' Statement of Facts, at ¶ 32 (Dckt. No. 35). Then, he "started reaching for something." *Id.* Officer Adamski then pulled him out of the vehicle, and Woods continued to resist – he "tensed up and was pulling away." *Id.* at ¶ 33. "Officer Adamski was struggling to get Plaintiff out of the vehicle and Plaintiff was resisting," so Officer Woods-Ortiz tased him. *Id.* at ¶ 36. Woods remained standing, so an officer took him down. *Id.* at ¶ 38.

But Woods tells a much different version of the story. And the existence of a competing narrative – backed by admissible evidence – is enough to create a question of fact for the jury.

Again, as Woods tells it, he woke up "startled," "shaken up," and confused, in a reclined driver's seat, with two police officers yelling and pounding on his windows. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 22, 26 (Dckt. No. 41). He reached for the lever to raise his seat to an upright position, and began to exit the vehicle with his hands up. *Id.* at ¶¶ 28–29 (Dckt. No. 41); *see* Pl.'s Statement of Facts, at ¶ 15 (Dckt. No. 41, at 10 of 13). According to Woods, he did what he was told when the officers "order[ed] plaintiff to get out of his vehicle." *See* Pl.'s Statement of Facts, at ¶ 14 (Dckt. No. 41, at 10 of 13). But despite his cooperation, they pulled him violently from the truck, shot him with a taser, and tackled him to the ground. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 34, 38.

The testimony from Woods is enough to defeat the summary judgment motion. Woods testified that he fully complied with the officers and obeyed their commands. *Id.* at ¶¶ 28–32. He did not resist. *Id.* at ¶ 36. Instead, he "cooperated," and exited the vehicle with his hands up.

*See* Pl.'s Statement of Facts, at ¶¶ 14–15 (Dckt. No. 41, at 10 of 13).  A reasonable jury could find that it was excessive to tase and tackle a person who was doing what he was told.

Defendants argue that police officers are "entitled to use appropriate force" to make an arrest "when a suspect is resisting."  *See* Defs.' Mem. in Supp. of Summ. J., at 15 (Dckt. No. 34).  But that argument begs the question.  Whether Woods resisted, and whether the force was appropriate, is up to the jury to decide.

The officers rely on the fact that Woods pulled away when he was removed from the truck.  *See* Defs.' Mem. in Supp. of Summ. J., at 13 (Dckt. No. 34).  But the act of pulling away does not necessarily mean that the use of force was appropriate.  Woods testified that he pulled away because the officer was hurting him.  *See* Pl.'s Resp. to Defs.' Facts, at ¶ 33 (Dckt. No. 41).  And if that's true – and the Court must assume that it is, for purposes of summary judgment – a jury could find that the force was excessive.

Woods admits that he pulled away from Officer Adamski when Adamski grabbed him.  But he claims that he pulled away because Officer Adamski was "violently yanking and hurting his wrists."  *Id.*  The testimony suggests self-defense – that is, that he pulled away because he was in pain from getting yanked around.  *See Abbott v. Sangamon County*, 705 F.3d 706, 727 n.4 (7th Cir. 2013) ("It is possible to view [the arrestee's] testimony to convey that the only fight he put up was to defend himself against excessive force.").  That is, he wasn't resisting, except to protect himself.  *Id.*

The Seventh Circuit has held that use of "unnecessary force on one who resists only that force can constitute excessive force."  *Id.* (citing *Morfin v. City of E. Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003)).  At summary judgment, it is not up to the Court to decide why Woods

pulled away. That's a question of fact. A jury needs to decide whether Woods pulled away to protect himself, or pulled away because he was resisting the police officer.

The officers also rely on the fact that Woods reached down next to his seat before exiting the vehicle. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 28, 29 (Dckt. No. 41). That fact is undisputed. Woods admits that he "showed his hands and then reached to raise up his seat with his left hand." *Id.* at ¶ 28. Woods "reached for the lever located between the door and the drivers' [sic] seat." *Id.* at ¶ 29. An officer saw his body "shift down towards the bottom of the seat." *Id.* at ¶ 30.

The officers imply – but never quite say – that they thought he was reaching for a weapon. *See* Defs.' Mem. in Supp. of Summ. J., at 8 (Dckt. No. 34) ("Any reasonable officer could have perceived a suspect reaching down between the door and seat as threatening or a basis for concern for officer safety."). The officers argue that Woods may have been reaching for something from "a concealed area." *Id.* at 13.

The officers aren't telling the full story, meaning the full story as told by Woods. Woods testified that he showed both hands to the officers, raised his seat, and then showed both hands again. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 28–29 (Dckt. No. 41); Pl.'s Statement of Facts, at ¶ 15 (Dckt. No. 41, at 10 of 13). According to Woods, he "began to exit the vehicle with his hands up" when an officer grabbed him. *See* Pl.'s Statement of Facts, at ¶ 15. At the suppression hearing, he testified that his hands were exposed, not concealed, when he exited the vehicle:

Q:     And when you went to raise your seat up, what did you do next?

A:     I was showing him my hands and got out the car.

Q:     And then you got out of the car? You did?

23

A:    Yes.

Q:    Okay.  And that's the order that you did it in; right?

A:    I let my seat up – I let my seat up.  I'm showing him my hands, and I'm getting out the car.

See Suppression Hr'g. Tr., Defs.' Ex. B, at 29:3-13 (Dckt. No. 35-2, at 30 of 60).

Woods presented admissible evidence that he attempted to exit the vehicle with his hands up, in full compliance with the commands of the officers.  If that's the case, then a reasonable jury could find that there was no reason to shoot him with a taser and tackle him to the ground. At trial, his story may or may not hold up, but that's for a jury to decide.

## III.    Qualified Immunity

Defendants also argue that the use of force is protected by qualified immunity.  *See* Defs.' Mem. in Supp. of Summ. J., at 15 (Dckt. No. 34).  But it depends on the facts, and the facts are in dispute.

Qualified immunity "protects government officials from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Viilo v. Eyre*, 547 F.3d 707, 709 (7th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Court looks at two things to determine whether qualified immunity applies: (1) whether a plaintiff's constitutional rights have been violated; and (2) whether the right at issue was "clearly established" at the time of the alleged misconduct.  *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Hanes v. Zurick*, 578 F.3d 491, 493 (7th Cir. 2009).  Courts can

decide which element to address first, in order to "best facilitate the fair and efficient disposition of each case." *Pearson*, 555 U.S. at 242.

To determine whether the law is "clearly established," courts must not define "clearly established law at a high level of generality." *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Specificity is important. *See Abbott*, 705 F.3d at 731 ("Importantly, the right must be clearly established in a particularized sense, rather than in an abstract or general sense.") (citations omitted). That said, a right can be clearly established even if there isn't a case directly on point, and "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* (citations omitted).

This case is a poor candidate for summary judgment on qualified immunity grounds because the defense depends on the facts, and the facts are very much in dispute. The officers claim that they are entitled to qualified immunity, but it depends on what happened. So a jury needs to decide what happened.

On one hand, it is "clear" that police officers do not have the right to "shove, push, or otherwise assault innocent citizens without any provocation whatsoever." *Clash v. Beatty,* 77 F.3d 1045, 1048 (7th Cir. 1996). Indeed, at the time of Woods's 2017 arrest, it was "well established in [the Seventh] Circuit that police officers could not use significant force on nonresisting or passively resisting suspects." *Abbott*, 705 F.3d at 732 (collecting cases). Instead, officers can only use minimal force in such situations. *Id.* (citations omitted). Plus, it is clearly established that officers cannot use excessive force once a suspect is subdued. *Id.* So, if Woods complied with the officers' demands, and was suddenly ripped from his truck, tased, and tackled, the officers would not be protected by qualified immunity.

At the same time, officers are entitled to use appropriate force to effectuate an arrest when the suspect is resisting. For example, the Seventh Circuit has found that it was not excessive for an officer to tase an actively resisting suspect, *see Abbott*, 705 F.3d at 727–28, or to use an "arm bar" or "wrist lock" technique to subdue an actively resisting suspect, *see Fitzgerald v. Santoro*, 707 F.3d 725, 734 (7th Cir. 2013). Officers can use significant force when a suspect actively resists arrest.

An officer can't shove or assault an innocent citizen, but an officer can use force to restrain a resisting arrestee. Applying the clearly established law to this case depends on the facts. But the facts are up in the air, with two competing stories to tell to a jury. Indeed, the parties can't even agree about whether Woods's truck was properly parked, let alone whether Woods complied and whether Woods remained standing after he was tased. *See* Defs.' Reply to Pl.'s Statement of Facts, at ¶ 8 (Dckt. No. 50); Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 12, 38 (Dckt. No. 41). A jury needs to sort it out.

Viewing the facts in the light most favorable to Woods, the Court cannot find that the exertion of force was objectively reasonable. *See Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008) (finding that the disputed facts "bear on the objective reasonableness of the force used to arrest [plaintiff], and therefore a trial is required before a determination can be made as to whether [defendant] is entitled to qualified immunity"); *Clash*, 77 F.3d at 1048 (denying summary judgment on qualified immunity claim because the Court lacked the "given facts" that either do or do not show a violation of "clearly established law"); *Pabon v. Brenka*, 2015 WL 110078, at *4 (N.D. Ill. 2015) (denying summary judgment based on qualified immunity for an excessive force claim); *Ortiz v. City of Chicago*, 2010 WL 3833962, at *13 (N.D. Ill. 2010)

("The upshot is that qualified immunity on the excessive force claim is not available – at least *at this time* – based on a murky factual picture and underdeveloped briefing.").

In the end, there is factual uncertainty, and the factual uncertainty means that Defendants are not entitled to summary judgment on qualified immunity. *See Gonzalez v. City of Elgin*, 578 F.3d 526, 541 (7th Cir. 2009) (holding that officers were not entitled to qualified immunity on excessive force claims at summary judgment where plaintiffs' account of the facts suggested a violation of clearly established law).

## IV.    Malicious Prosecution (Count IV)

Woods also claims that Defendants maliciously prosecuted him for unlawful possession of a firearm and resisting a police officer.  Defendants move for summary judgment on this claim, too.  They argue that Woods lacks evidence on two of the five elements.

To prove the tort of malicious prosecution under Illinois law, Woods must show that "(1) the City initiated criminal proceedings against him; (2) those proceedings were terminated in his favor; (3) there was no probable cause to support the proceedings; (4) malice was present, *i.e.*, that the officer who initiated the proceedings was motivated by something other than a desire to bring a guilty party to justice; and (5) he suffered damages as [a] result of the proceedings." *Seiser v. City of Chicago*, 762 F.3d 647, 659 (7th Cir. 2014); *Washington v. Summerville*, 127 F.3d 552, 557 (7th Cir. 1997) (citing *Swick v. Liautaud*, 169 Ill. 2d 504, 512, 215 Ill. Dec. 98, 662 N.E. 2d 1238 (1996)).  Defendants argue that Woods can't show that the proceedings terminated in his favor (the second element), or that there was no probable cause to support the proceedings (the third element).

The Court's analysis starts and ends with the second element, a showing that the proceedings terminated in his favor.  Woods must show that the criminal proceedings terminated

in a manner indicative of his innocence. *See Washington*, 127 F.3d at 557 ("In order to fulfill the second element, a plaintiff cannot predicate his malicious prosecution action on underlying criminal proceedings which were terminated in a manner not indicative of the innocence of the accused."); *Bridewell v. City of Chicago*, 2012 WL 2458548, at *4 (N.D. Ill. 2012) (finding that plaintiff had not carried her "burden of showing that the criminal prosecution concluded in a manner indicative of innocence") (citing *Swick*, 169 Ill. 2d at 513). The relevant question, then, is whether his criminal case ended "for reasons consistent with his innocence." *Swick*, 169 Ill. 2d at 513.

It is not enough to show that the prosecution dismissed the charges. "The plaintiff meets his burden of proof only when he establishes that the *nolle prosequi* was entered for reasons consistent with his innocence." *See Washington*, 127 F.3d at 557. In fact, the "circumstances surrounding the cessation of the criminal proceedings must compel an inference that reasonable grounds to pursue the criminal prosecution were lacking." *Id.* The Illinois Supreme Court imposed this burden for a reason: "otherwise, every time criminal charges are nol-prossed, a civil malicious prosecution action could result." *Id.* (quoting *Swick*, 169 Ill. 2d at 514) (cleaned up).

"The abandonment of the proceedings is not indicative of the innocence of the accused when the *nolle prosequi* is the result of . . . the impossibility or impracticability of bringing the accused to trial." *Swick*, 169 Ill. 2d at 513. The dismissal of a criminal case after the suppression of evidence is not enough, unless the court suppressed the evidence for reasons that show the innocence of the defendant (*e.g.*, fabricated evidence). *See, e.g., McWilliams v. City of Chicago*, 451 F. Supp. 3d 867, 880 (N.D. Ill. 2020) (concluding that the dismissal of the criminal case did not suggest innocence when "it would have been impossible or impracticable for

prosecutors to have continue to pursue the criminal charges against plaintiff after the motion to quash and suppress was granted"); *Rosado v. Mora*, 2019 WL 4450523, at *6 (N.D. Ill. 2019) ("Courts have repeatedly found that dismissal *nolle prosequi* does not indicate innocence when it follows suppression of evidence for reasons unrelated to reliability – especially prophylactic rules like . . . the Fourth Amendment's exclusionary rule.") (citing cases); *Chachere v. City of Chicago*, 2018 WL 1087643, at *9 (N.D. Ill. 2018) (finding that dismissal of a criminal case was not indicative of innocence after the defendant prevailed on a motion to suppress); *Johnson v. City of Chicago*, 2016 WL 5341810, at *5 (N.D. Ill. 2016) (reaching the same result when the trial court in the criminal trial suppressed evidence that a firearm was found); *Johnson v. Arroyo*, 2010 WL 1195330, at *3 (N.D. Ill. 2010) (holding that "a dismissal following suppression of evidence for a technical reason" that did not call into question the reliability of the evidence or pertain to culpability "is not a reason indicative of innocence, so it cannot support a malicious prosecution claim").

Woods musters no such evidence. He simply argues that he had a chance at winning on the firearm charge at trial. Maybe. But that optimistic outlook doesn't explain why the prosecutor dropped the charges.

The Seventh Circuit addressed similar facts in *Washington*. Washington repeatedly asserted that his testimony was coerced, and the trial judge eventually granted Washington's motion to suppress the incriminating statements. *Washington*, 127 F.3d at 558. After the trial court suppressed the evidence, the state declined to prosecute. *Id.* But there was no recorded reason for the *nolle prosequi*, which the Seventh Circuit explained "offers no insight as to the validity or invalidity" of Washington's innocence. *Id.* "A bare nolle prose without more is not indicative of innocence." *Id.*

29

Here, the trial court suppressed Woods's firearm, and the state later dropped the charges against Woods. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 44 (Dckt. No. 41). There is no evidence that the court in the criminal case suppressed the evidence of the gun because it believed that he never possessed the gun in the first place. Instead, the court suppressed the evidence because the officers lacked probable cause for the search. *See Rosado*, 2019 WL 4450523, at *6 ("[T]he trial court here did not exclude the drugs because it believed Rosado never possessed them. Rather, the court excluded the drugs because, in its view, the officers lacked the suspicion needed to justify the search that uncovered the drugs."). So the "dismissal was not indicative of innocence." *Id.*

If anything, Woods has admitted facts that show that the dismissal was not because of his innocence. Woods admitted that he did, in fact, have a loaded handgun in the truck at the time of the arrest. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 40 (Dckt. No. 41). As he admitted, the semiautomatic firearm was under his seat. *Id.* at ¶ 42. This case does not involve actual innocence, say, from mistaken identity or fabricated evidence. It involves a party who admittedly possessed a firearm at the time of arrest, but escaped prosecution because the police lacked probable cause. So he possessed the gun. The state simply couldn't prove it.

Woods has not come forward with evidence supporting one of the elements of his claim. The Court grants Defendants' motion for summary judgment on the malicious prosecution claim.

## V.     Failure to Intervene (Count II)

Defendants also move for summary judgment on the failure to intervene claim. Police officers "who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's right through the use of excessive force but fail to do so" may be held liable for failure to intervene under section 1983. *See Harper v. Albert*, 400 F.3d 1052, 1064

(7th Cir. 2005) (citing *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000)).  The officer is subject to liability for failure to intervene if he had reason to know:  "(1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring."  *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (quoting *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir. 1994)) (emphasis in original).

The Seventh Circuit has recognized that failure to intervene cases often go to a jury. "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury *could not possibly conclude otherwise*."  *Abdullahi*, 423 F.3d at 774 (quoting *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 478 (7th Cir. 1997)) (emphasis in original).

By definition, a claim about a failure to intervene to prevent a constitutional violation requires a showing that a constitutional violation occurred.  *See Harper*, 400 F.3d at 1064 (citing *Fillmore v. Page*, 358 F.3d 496 (7th Cir. 2004)).  But here, the underlying conduct remains in dispute.  Like *Abdullahi*, this case involves questions of fact about the underlying constitutional violations, so the associated claim for failure to intervene isn't amenable to summary judgment, either.  *See Abdullahi*, 423 F.3d at 774.  Like the underlying constitutional claims, the failure to intervene claims must go to trial, too.

## VI.    Assault and Battery (Counts V & VI)

Woods also lodges state law claims for assault and battery against the officers. Defendants move for summary judgment on those claims under the Illinois Local Governmental

and Governmental Employees Tort Immunity Act, 745 ILCS 10/2-202.  *See* Defs.' Mem. in Supp. of Summ. J., at 11 (Dckt. No. 34).  Defendants argue that, under Illinois law, they are shielded from liability for these state law tort claims unless the officers acted in a willful and wanton manner.  *Id.*

Defendants hitch their wagon to probable cause.  Under Illinois law, the existence of probable cause for the stop and seizure means that the officers didn't act in a willful and wanton manner.  *See Ross v. Mauro Chevrolet*, 369 Ill. App. 3d 794, 802, 308 Ill. Dec. 248, 861 N.E.2d 313 (2006).  Actions are not willful and wanton if they are "objectively reasonable" under the Fourth Amendment.  *See Horton v. Pobjecky*, 883 F.3d 941, 954 (7th Cir. 2018) (affirming district court holding that, since the officer's actions were objectively reasonable, "they cannot be willful and wanton").

But once again, it all depends on the facts.  Whether there was probable cause for the arrest depends on the facts, and the facts are very much in dispute.  So a jury must sort it out.  The motion for summary judgment on the assault and battery claims is denied.

## Conclusion

The Court grants in part and denies in part Defendants' motion for summary judgment.  The Court grants Defendants' motion for summary judgment on the false arrest claim (Count I) for the initial investigation.  The Court denies Defendants' motion for summary judgment on the false arrest claim (Count I) for the detention and arrest itself.  The Court grants Defendants' motion for summary judgment on the malicious prosecution claim (Count IV).  The Court denies Defendants' motion for summary judgment on the remaining claims.

Date:   November 24, 2020

_____

Steven C. Seeger
United States District Judge